IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT COURT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,                  No. 2:11-cr-00227-KJM

   vs.

DAMIAN RASHEED LAW,

        Defendant.            <u>ORDER</u>

          /

        This matter is before the court on defendant Damian Rasheed Law's motion to suppress evidence seized during a warrantless vehicle search at a traffic stop. (ECF No. 14.) The court heard argument on Law's motion and testimony at a later evidentiary hearing. The court also considered the parties' supplemental briefs after the evidentiary hearing, and heard additional argument concerning the same. Michael Petrik, Jr., from the Office of the Federal Defender, appeared for defendant Law, who was present at all proceedings; Todd D. Leras, Assistant U.S. Attorney, appeared for the government. The court ultimately concludes, after a careful and searching review of the record and considered reading of the applicable law, that the Law's motion should be DENIED, for the reasons stated below.

///

///

1

I.  FACTS

The following facts were elicited from Officers Chuck Bailey, Julie Bailey and Roderick Neal as well as Cadet Vincent Santoni at the evidentiary hearing on November 7, 2011; they also are drawn from Officer Chuck Bailey's police report. These facts provide the factual background for resolution of the issues presented in defendant Law's motion.

On May 5, 2011, at approximately 10:00 p.m., Officer Chuck Bailey was driving his marked patrol car, with Cadet Santoni as a passenger on a ride along. The officer, who had twenty-one years' experience as a policeman, observed a gray Cadillac CTS perform an illegal U-turn against a "No U-Turn" sign. (Rep.'s Tr. Evidentiary Hr'g ("R.T.") 6:22-24, 7:8–8:11, ECF No. 23; Mot. Suppress Evidence, Ex. A ("Police Rep."), at 1, ¶ 2, ECF No. 14-1.) Officer Bailey pursued the Cadillac in his marked car. (R.T. 8:14.) As the Cadillac prepared to turn left, Officer Bailey turned on the patrol car's emergency lights to perform a traffic stop. (R.T. 8:15–21.)

The officer testified that at the outset of the traffic stop, the driver's movements within the Cadillac aroused his suspicion. While the Cadillac changed lanes, Bailey and Cadet Santoni observed the driver "make several furtive movements, [then he] crossed his body with his right hand and reached towards the center console in the floorboard area of the Cadillac." (R.T. 8:22–9:4; *accord* R.T. 48:4–16.) "Since the driver was making . . . furtive movements," Bailey then illuminated the interior of the Cadillac with a spotlight as the car turned right and yielded to the curb. (R.T. 9:21–24.) Bailey observed the driver continue to move. (R.T. 9:25–10:3.) With both cars stopped, Bailey testified: "Due to the fact the driver had made several movements, I withdrew my pistol as I approached the driver." (R.T. 10:7–8.)

The driver did not comply with Bailey's orders when Bailey first approached the car. As Bailey neared the driver's side window, which was already rolled down, he ordered the driver, defendant Law, to place his hands on the steering wheel. (R.T. 11:3–8.) Law placed his left hand on the wheel, but kept his right hand between his legs. (R.T. 11:10–13.) Bailey ordered Law, again, to place his hands on the wheel, and Law this time complied. (R.T. 20–21.)

Regarding this initial exchange, Bailey testified that "[Law] seemed a little nervous. As I was talking to him, he was very sweaty." (R.T. 11:22–12:3.) Bailey initiated conversation with Law and explained the reason for the traffic stop. Law identified himself verbally and said that he had seen the "No U-Turn" sign when he was already in the middle of his turn. (R.T. 12:11–22.)

Law said he did not have his driver's license on him. (R.T. 12:23-24.) Bailey told Law to keep his hands on the steering wheel and returned to his patrol car to perform a records check. (RT 12:25-13:6.) As Bailey passed behind Law's car, Cadet Santoni observed: "[Law] had his right hand down and his left hand up on the steering wheel," and he "turned over his right shoulder and looked twice over his right shoulder." (R.T. 49:23–50:9.) Then, Santoni observed Law "lean[] down towards underneath his seat and was reaching with his right hand underneath the seat—or in between the center console and the seat." (R.T. 50:19–23.)

Santoni told Bailey about Law's movements. (R.T. 13:5–13, 41:1–5, 51:1-7.) Bailey then approached the Cadillac from the passenger side and stood in the shadows to watch Law surreptitiously as he performed the records check. (R.T. 13:14–21.) While Bailey performed the records check, Bailey observed Law make "several movements with his right hand towards the floorboard and underneath the driver's seat of the Cadillac." (R.T. 13:22–14:11.)

Bailey drew his pistol again and again ordered Law to place his hands on the steering wheel because he feared Law was reaching for a weapon. Law placed both of his hands on the steering wheel, and Bailey approached the driver's side window. (R.T. 14:12–15.) Bailey requested backup and then held Law at gunpoint until backup arrived. (R.T. 14:22–15:2, 16:6–7.) At this point, Bailey observed that Law had a cell phone in his right hand and his left hand was holding onto the steering wheel. (R.T. 15:22–16:4.)

Law resumed trying to reach under the seat until Bailey grabbed his arm. Bailey ordered Law to step out of the vehicle. Law asked why; Bailey told him, "because you keep moving, reaching, and I don't know what you are doing." (R.T. 42:21–43:3.) Law

explained that he was "just trying to pick up [his phone]." (Police Rep. 2, ¶ 2.) As Law was speaking, he "made a real quick movement and grabbed towards the ground over to the floorboard of the car." This movement was with his left hand. (R.T. 35:23–24, 43:5-11.) Bailey reached into the window and grabbed Law's left arm, while ordering him to stop moving or Bailey would shoot. (R.T. 35:21–36:21, 91:5–6, 91:13–17.)

Officer Roderick Neal's testimony supplements Bailey's version of events. Neal, who has eighteen years' experience as a police officer, arrived to assist Bailey. (R.T. 85:6-17.) Neal parked his patrol car behind Bailey's. (R.T. 17:18–19, 88:14-15.) As he exited, Neal "could see Officer Bailey standing on the driver's side of the Cadillac with his gun pointed at the driver." (R.T. 88:15–17.) Neal heard "Officer Bailey telling the driver to keep his hands on the steering wheel, to quit reaching and put his hands on the steering wheel," and Neal observed the driver "reaching underneath the seat" as if "he was reaching for something." (R.T. 88:23–25, 89:3–7.) In response, Neal "told Officer Bailey that it looked like [Law] was reaching," and Bailey responded "that the driver kept saying he was reaching for his cell phone." (R.T. 89:21–23.) Neal told Bailey that Law "already has his cell phone in his hand, get him out of the vehicle he's reaching for something else." (R.T. 89:24–90:1.) Neal testified that, at the time, he "was concerned [Law] was reaching for a handgun." (R.T. 90:13–17.)

Although the officers became concerned Law had a weapon, they did not actually observe a weapon. Bailey testified: "I told [Neal] that the driver kept making movements and that I'm going to have him removed from the vehicle." (R.T. 17:23–25.) Based on his concern that Law "might have some sort of weapon underneath" the seat, Bailey removed Law from the car. (R.T. 18:7–12.) On cross-examination, Bailey confirmed that before he removed Law from the Cadillac, he never observed a weapon in the car, and Law never said he had a weapon. (R.T. 26:7–27:16.)

Law was then removed from the vehicle, placed face-down on the ground, and handcuffed. (R.T. 21:7-16.) Law was moved away from the Cadillac, and placed into the back of the patrol car, which was locked. (R.T. 21:13-16, 91:23–92:5.) According to Officers Bailey and Neal, Law was handcuffed and placed into the car because of "his behavior" and

4

failure to follow "commands with Officer Bailey," and for officer safety to "make sure he was secured inside the vehicle." (R.T. 21:19-25, 93:12–17.)

After Law was placed in the patrol car, Bailey looked inside the Cadillac and under the driver's seat. (R.T. 22:4–10, 92:14-16, 93:8–10.) Bailey smelled the odor of marijuana from the interior, and without moving anything he observed a silver semiautomatic handgun on the floor under the seat. (R.T. 22:10, 23:25–24:2.) Law was then placed under arrest for having a handgun in the vehicle. (R.T. 24:3–11.)

Neal estimated from the time he arrived on scene to the time Bailey saw the handgun it was "a couple of minutes. A minute or two." (RT 92:22-93:2.)

Bailey then requested a police canine unit, and Officer Julie Bailey arrived with her police dog Cir. (R.T. 25:4–12.) Cir alerted to the passenger's seat and the trunk of the car, where the officers discovered a large amount of methamphetamine. (R.T. 68:12–69:7, 74:10–75:2.)

On May 19, 2011, the United States filed charges against Law for possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A). (ECF No. 1.) Law moves to suppress the handgun, narcotics, and any other evidence found in the Cadillac. The government opposes.

II. ANALYSIS

Law argues the evidence seized from inside the Cadillac should be suppressed because probable cause to arrest Law and subsequently search the car was established only after an illegal warrantless search. (Def.'s Mot. Suppress 7:18–8:15, ECF No. 14; Def.'s Supp. Briefing 6:19–7:25, ECF No. 59.) Because the other evidence, including the narcotics, was obtained based on the probable cause provided by the gun's discovery, Law contends this evidence must be suppressed as well. (Def.'s Mot. Suppress 9:7–8.)

The government counters the handgun is admissible because the initial search under the seat was justified under the automobile exception to the warrant requirement, and as a "protective search" under *Terry v. Ohio*, 392 U.S. 1 (1968). (Gov't's Supp. Opp'n 9:19–

5

10:16, 11:6–13:2, ECF No. 60.) Because the handgun was obtained lawfully, the government argues the gun itself supported probable cause to arrest Law; because the police would have followed established procedures and impounded and inventoried the car following the weapons arrest, the rest of the evidence is admissible under the inevitable discovery doctrine. (*Id.* at 10:9–11, 13:3–8; Gov't's Opp'n Def.'s Mot. Suppress Ev. ("Opp'n") 14:7–15:2, ECF No. 15.)

"The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *United States v. Scott,* 705 F.3d 410, 416 (9th Cir. 2012). For the reasons stated below, the court concludes the government has met its burden to show there was probable cause to search the car.

A. The Initial Search of the Vehicle Locating Firearm

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Thus, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (internal quotation marks omitted). Among these exceptions are the "automobile exception," *id.* at 347 (citing *United States v. Ross*, 456 U.S. 798, 820–21 (1982)), and the "protective search" exception, which "permits an officer to search a vehicle's passenger compartment when he has reasonable suspicion that an individual . . . is 'dangerous' and might access the vehicle to 'gain immediate control of weapons.'" *Id.* at 346–47 (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)).

In the present case, Law does not challenge the traffic stop. At the same time, the government concedes Law has standing to challenge the search, and that the search was conducted without a warrant. (Opp'n 1:20–22.) Thus, the issue to be decided is whether the officers' initial search underneath the driver's seat was lawful under either the automobile or the protective-search exception to the warrant requirement.

The government in its opposition brief and oral argument merges these two exceptions, arguing a warrantless search may be justified by "considerations of officer safety

[and] evidence preservation." (Opp'n 12:9–14 (citing *Gant*, 173 L.Ed.2d at 491, 496–98).) The exceptions are separate and justified by distinct considerations, however. *Compare Carroll v. United States*, 267 U.S. 132, 153 (1925) (evidence preservation supports the automobile exception to the warrant requirement, in that it is "not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought"), *and Ross*, 456 U.S. at 806-07 ("the impracticability of securing a warrant in cases involving the transportation of contraband goods[,] . . . . viewed in historical perspective, [] provided the basis for the *Carroll* decision. . . the Court recognized that an immediate intrusion is necessary if police officers are to secure the illicit substance. In this class of cases, . . . a warrantless search of an automobile is not unreasonable.") *with Michigan v. Long*, 463 U.S. at 1049 ("protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, [because] roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect"). *See also Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam) (exceptions to warrant requirement are distinct and "well-delineated"). Because the automobile exception is satisfied in this case, and the court need not reach the protective search option, the court analyzes only the former exception below.

1. The Automobile Exception

The automobile exception to the warrant requirement applies if the search was "based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained," i.e., probable cause. *Ross*, 456 U.S at 809. An officer has probable cause to search a car without a warrant "when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Ewing*, 638 F.3d 1226, 1231 (9th Cir. 2011); *accord Ornelas v. United States*, 517 U.S. 690, 696 (1996) ("probable cause to search . . . exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found"). Probable cause must be justified by

7

"objective facts known to the officer at the time of the search," which support a reasonable conclusion that the police will find what they are looking for "in the place to be searched." *United States v. Rodgers*, 656 F.3d 1023, 1029 (9th Cir. 2011) (internal quotation marks omitted).

"Under the totality of the circumstances test, otherwise innocent behavior may be indicative of criminality when viewed in context." *United States v. Chavez–Miranda*, 306 F.3d 973, 978 (9th Cir. 2002). Factors that courts have found significant in applying this test include:

- apparent nervousness, *Ewing*, 638 F.3d at 1231–32;
- "profuse perspiration," *United States v. Perez*, 37 F.3d 510, 514 (9th Cir. 1994), *overruled on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005);
- "concealing movements in the automobile's front seat," *United States v. Spencer*, 1 F.3d 742, 746 (9th Cir. 1992); *see also United States v. Horn*, 234 F. App'x 466, 467 (9th Cir. 2007) (unpublished) ("furtive movement to conceal something");
- "perceived inconsistency" between statements and appearance, *Perez*, 37 F.3d at 514;
- failure of car passengers to "promptly comply with orders to . . . show their hands," *United States v. Martinez–Cortes*, 566 F.3d 767, 771 (8th Cir. 2009); and
- the "training and experience of . . . police officers." *Chavez–Miranda*, 306 F.3d at 978.

As Law points out, "furtive movements" prior to a traffic stop, without more, are insufficient to support probable cause to search a vehicle. He relies on the case of *United States v. Parr*, 843 F.2d 1228, 1229 (9th Cir. 1988), in which the defendant driver was pulled over on suspicion of a suspended license. As the police officer was pulling the car over, the officer noticed the defendant "and a companion in the car bend towards the floorboard and 'make furtive movements.'" *Id.* The defendant exhibited no other suspicious action or behavior before the warrantless search, which occurred after he was placed in a police car but was not subject to an arrest. *See id.* The court, finding "nothing in the record to support the requisite probable cause that contraband existed," concluded that the warrantless search of Parr's car could not be justified under the automobile exception, in addition to not being justified as incident to arrest. *Id.* at 1231–32. *See also United States v. Smith*, 389 F.3d 944, 952 n.2 (9th Cir. 2004) ("*Parr*

merely holds that without formal custodial arrest, the search incident to arrest exception is unavailable to justify a warrantless vehicle search.").

Considering the totality of the circumstances in this case, the court finds it is distinguishable from *Parr*, and that the officers had probable cause to search underneath the driver's side seat of the car Law was driving. There was a fair probability they would find contraband or evidence of a crime there. As reviewed above, the record here discloses that while Officer Bailey was stopping the car, the officer noticed Law make several "furtive movements" in the direction of the Cadillac's floorboard. These furtive movements occurred not only as Law was being pulled over but continued while the car was spotlighted, when Officer Bailey initially approached the driver's side window, and when Bailey returned to his cruiser to perform a records check. After Bailey neared the driver's side window and ordered Law to place his hands on the steering wheel, Law placed only his left hand on the wheel, but kept his right hand between his legs. Even after putting both hands on the wheel as directed, when Bailey told Law to leave them there, he did not comply. As Officer Bailey performed a "records check" from the shadows beside the passenger's side window, Law again made movements toward the floorboard and underneath the driver's seat.

Law persisted in reaching under the driver's side seat as the traffic stop continued, even when he was at gunpoint. In response to Bailey's order to step out of the car, Law explained he was "just trying to pick up his phone." But at the same moment, Law made another quick movement toward the floorboard, prompting Bailey to grab his arm, while ordering him to stop or be shot.

The officers observed additional objective indicia at the scene that Law was likely concealing contraband or evidence of a crime underneath the driver's side seat. Officer Bailey observed Law appeared "nervous" and "sweaty." *Cf. Ewing*, 638 F.3d at 1231–32 (noting apparent "nervousness" among several factors supported probable cause); *Perez*, 37 F.3d at 514 (noting defendant's "nervous behavior" and "his profuse perspiration" as "suspicious factors"). Law repeatedly failed to comply with commands to place his hands on the steering wheel. *Cf. Martinez–Cortes*, 566 F.3d at 771 & n.3 (concluding that, because

9

"occupants of the Excursion did not promptly comply with orders to . . . show their hands," the "occupants' furtive actions when the Excursion was stopped gave the officers probable cause to believe that contraband or other evidence of drug crimes would be found in the stopped vehicle"). Officer Neal, based on his training and eighteen years' experience, "perceived inconsistency" between Law's statements that he was reaching for his cell phone while he held a cell phone in his hand. *Cf. Perez*, 37 F.3d at 514 (reasoning that "perceived inconsistency can also contribute to a finding of reasonable suspicion"); *see also Chavez–Miranda*, 306 F.3d at 978 (probable cause to search may be supported in part by "the training and experience of affiant police officers").

Taken together, all of the facts and circumstances known by the experienced officers at the time of the initial search were "sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime" would be found in the place to be searched, underneath the driver's side seat of the car Law was driving. *Ornelas*, 517 U.S. at 696. In reaching this conclusion, the court relies on the testimony of the officers and Cadet Santoni, finding the testimony reliable and credible, and finding no inconsistencies inherent in their accounts, considered both separately and together.

Also in reaching this conclusion, the court notes that while "furtive movements" alone would not be sufficient to justify the search, the facts here establish "furtive movements-plus." Courts have consistently held that furtive movements plus additional suspicious circumstances together support probable cause to search a vehicle without a warrant. For example, in *United States v. Evans*, the Ninth Circuit held there was "probable cause to search" defendant's car for "drug paraphernalia" based on defendant's "furtive movements" plus the defendant's statement. 445 F. App'x 29, 31–32 (9th Cir. 2011) (unpublished), *cert. denied*, __ U.S. __, 132 S. Ct. 1906 (2012). In *United States v. Martinez–Cortes*, the Eighth Circuit held there was "probable cause to believe that contraband or other evidence of drug crimes would be found in [a] stopped vehicle," based on "furtive actions" plus the vehicle occupants' failure "to promptly comply with orders to . . . show their hands." 566 F.3d 767, 771 & n.3 (8th Cir. 2009). Federal district courts that have considered the

10

question have reached the same conclusion. *See, e.g.*, *United States v. Bullock*, No. 08-CR-194, 2009 WL 1770120, at *3–4 (E.D. Wis. June 23, 2009) ("[D]efendant's furtive gestures, coupled with the other circumstances, gave the officers probable cause to search the center console of defendant's car for contraband."); *United States v. Woodruff*, 830 F. Supp. 2d 390, 401 (W.D. Tenn. 2011) ("The facts demonstrate that the officers observed suspicious movement on the part of a suspect who possessed several IDs belonging to Hispanic individuals in a neighborhood where Hispanics were prone to be robbed. Taken together, these facts alone establish probable cause to search the vehicle for evidence of robbery."); *United States v. Torres*, No. 10-CR-1159-JGK, 2011 WL 2209144, at *8 (S.D.N.Y. June 7, 2011) (defendant reached for hidden compartment as police approached vehicle and officer knew "she had filed previous complaints against the defendant for illegal possession of weapons"; under totality of circumstances, officer "had probable cause to believe that the defendant was illegally in possession of a firearm and that the hidden compartment contained evidence of this criminal activity." (citation omitted)); *United States v. Franklin*, No. 1:09-CR-11, 2009 WL 1952082, at *8 (N.D. Ind. July 6, 2009) ("Franklin's own actions of moving about inside his car when he was pulled over provide strong, albeit circumstantial, evidence corroborating the officers' belief that he was attempting to retrieve and/or conceal something inside the passenger compartment. [Considered together with a large bag under driver's seat,] the court concludes that . . . the officers had probable cause to . . . conduct a search of his vehicle . . . .").

The court's conclusion that the initial search in this case was within the automobile exception to the warrant requirement is consistent with the principles protected by the Fourth Amendment. The warrant requirement is subject to "narrow and well-delineated exceptions," *Flippo*, 528 U.S. at 13, and the Supreme Court instructs that the exceptions follow from "the ultimate touchstone of the Fourth Amendment," "'reasonableness.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo*, 528 U.S. at 13; *Katz v. United States*, 389 U.S. 647, 357 (1967)). In this case, the search underneath the driver's seat was confined to what was minimally necessary to determine whether a gun or other dangerous item was underneath the seat. *Cf. Terry*, 392 U.S. at 30 (police officer "confined his search strictly to

11

what was minimally necessary" to achieve protective purpose of that search). The warrantless search underneath the driver's side seat of the vehicle Law was driving was lawful.

B. Inevitable Discovery of Narcotics and Other Evidence

The government contends that the inevitable discovery doctrine applies to the admissibility of the narcotics and the other evidence found in the Cadillac. "[I]f, 'by following routine procedures, the police would inevitably have uncovered the evidence,' then the evidence will not be suppressed despite any constitutional violation." *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009) (quoting *United States v. Ramirez–Sandoval*, 872, F.2d 1392, 1399 (9th Cir. 1989)).

In this case, Law was arrested on probable cause for possession of a loaded firearm in a vehicle on a public street in violation of California Penal Code §§ 12025(a)(1) and 12031(a).[1] Under established procedures, the police officers were required under these circumstances to take Law into custody and impound the car. CAL. VEH. CODE § 22651(h)(1). (*See also* R.T. 95:24–97:18.) Before impound, the Cadillac would have been searched and its contents inventoried under the Vacaville Police Department's tow policy. (R.T. 96:15–97:18.)

At oral argument on May 5, 2013, defense counsel conceded that if the court found probable cause for the initial search, which turned up the firearm, then the government would meet its burden on inevitable discovery.

The court finds that the narcotics and other evidence would have been inevitably discovered through a routine inventory search.

III. CONCLUSION

For the foregoing reasons, defendant Law's motion to suppress is DENIED.

IT IS SO ORDERED.

DATED: June 5, 2013.

_____
UNITED STATES DISTRICT JUDGE

---

[1] These provisions of the California Penal Code have since been recodified at Penal Code § 25850, effective January 1, 2012.

12